DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Tamara D. Hazard, as executrix of the estate of Stella Shields, appeals from a judgment of the Summit County Court of Common Pleas finding Appellees, Jeffrey J. Klein, M.D., Inc. and Jeffrey J. Klein, M.D., not liable for medical malpractice and wrongful death. We affirm.
 I. {¶ 2} Stella Shields died on July 21, 2002, at age 63, as the result of breast cancer that had metastasized throughout her skeletal system. Shields was a regular patient of Appellant, Dr. Jeffrey J. Klein. Shields came to Klein's office once in 2 1994 and again in 1996 for routine physical examinations and on a number of other occasions with a variety of medical complaints. At both of the regular physicals, Klein performed physical breast examinations and ordered mammograms for Shields. None of these tests raised any suspicions of cancer.
 {¶ 3} On August 12, 1997, Shields contacted Klein's office complaining of tenderness in her right breast. Klein was not in the office, but his office manager ordered a mammogram, which was performed on August 18, 1997. The report of the radiologist who interpreted the mammography results noted dense areas in both breasts that appeared to be benign. However, the radiologist also recommended that Shields have a "critical clinical correlation" — essentially, a corroborating physical breast examination — and another mammogram in six months. By the time Klein discussed Shields' mammogram results with her, the tenderness had subsided and Klein determined that no physical examination would be necessary at that time.
 {¶ 4} Although there is no documentation to suggest that the clinical correlation and the follow-up mammogram were performed pursuant to the radiologist's recommendation, Shields contacted Klein's office again in late March 1998, about seven months after the August 18, 1997 mammogram, complaining of a nipple retraction on her right breast that had appeared two or three months before. Klein performed another breast examination on March 27, 1998. Although he found no abnormalities other than the retracted nipple, he referred Shields for another mammogram, which was performed on April 3, 1998. The radiologist's report noted the presence of a dense spot in the upper outer quadrant of Shields' right breast, which was essentially unchanged from Shields' prior mammograms and therefore, in the radiologist's opinion, did not indicate that cancer might be present. Nevertheless, the radiologist, Dr. John Lahorra, indicated that it would be "prudent to consider" a biopsy in light of Shields' nipple retraction, although Lahorra testified that he deliberately stopped short of "recommending]" a biopsy, seeing "no worrisome findings" on the mammogram films, and that he left the specific location for any biopsy up to the evaluating surgeon.
 {¶ 5} On receiving Lahorra's report, Klein referred Shields to Dr. Gary Williams, a general surgeon. After performing a physical breast examination and an ultrasound examination and reviewing the mammography films, Williams determined that the dense spot on Shields' mammogram did not appear to be a cause for concern, being unchanged from prior mammograms, and decided that a biopsy would not be appropriate. Williams did, however, biopsy some unusual tissue near Shields' nipple. The tissue sample was found to be benign and the retracted nipple returned to normal after the biopsy was performed. Williams reported to Klein that there was no need for follow-up other than routine examinations.
 {¶ 6} Shields returned to Klein's office for another routine physical on June 4, 1998, and Klein performed another breast examination, which revealed no abnormalities. For about a year, Shields continued to see Klein for various medical complaints not related to her breast, at which time she switched to another primary care physician, Dr. Mark McRoberts. Shields saw McRoberts for a regular physical examination late in 1999, at which time McRoberts ordered another mammogram for her. The mammogram was performed in February 2000 and showed no abnormalities.
 {¶ 7} After complaining of back pain in early 2001, Shields underwent a bone scan, which revealed that cancer had metastasized through her entire skeletal system. Tests indicated that the cancer had originated in her breast. Several breast examinations and mammograms performed at this point revealed no suspicious masses indicative of cancer. Ultimately, a breast surgery specialist, Dr. Rosemary Leeming, decided to perform a biopsy of a small abnormality near the dense area in Shields' right breast, even though Leeming did not believe the abnormality to be particularly suspicious in itself. The biopsy indicated the presence of cancer.
 {¶ 8} Appellant, as executrix of Shields' estate, filed suit against Williams, Klein, their professional corporations, and nine other defendants, alleging medical malpractice and wrongful death. Pursuant to a settlement, the complaint was dismissed as to all defendants except Williams, Klein, and their professional corporations.
 {¶ 9} Both during the deposition stage and at trial, Williams introduced expert testimony from Dr. Daniel Guyton. Guyton testified that in his opinion, Shields' cancer had already spread to her bones and become difficult or impossible to treat by 1998, when Williams first saw Shields. The jury deliberated for three days and sent several notices to the Court that they had reached a deadlock as to Appellants. The jury was instructed to continue deliberations, and a verdict was eventually returned in favor of Klein, Williams, and their professional corporations. A specific finding was made that Williams had not failed to comply with the standard of care in any respect. The jury further found that Klein failed to comply with the standard of care by failing to document a clinical correlation and a follow-up mammogram within six months after the August 18, 1997 mammogram, as recommended by the radiologist, but that these failures did not proximately cause Shields' death. Appellant timely filed this appeal as to Klein and his professional corporation only, raising one assignment of error.
 II. Assignment of Error "REVERSIBLE ERROR WAS COMMITTED WHEN THE TRIAL JUDGE PERMITTED THE INTERJECTION OF THE MICROSCOPIC METASTASES PROXIMATE CAUSE DEFENSE WITHOUT FIRST VERIFYING ITS RELIABILITY."
 {¶ 10} On December 5, 2005, just before trial commenced, Appellant filed a motion in limine to exclude expert testimony to the effect that Shields' cancer had already metastasized to her bones in 1998. Specifically, the motion sought to exclude expert testimony by Dr. Arnold Baskies, who testified at a deposition that Shields' cancer had probably metastasized and that the metastasis was a function of the histology, or genetic pattern, of Shields' cancer cells. Appellant claimed that such testimony was not sufficiently relevant, reliable, or supported by scientific evidence to be admissible, under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 589, and subsequent cases, including Miller v. Bike AthleticCo. (1998), 80 Ohio St.3d 607, 616, and Valentine v. PPG Industries,Inc., 158 Ohio App.3d 615, 2004-Ohio-4521, at ¶ 26, affirmed sub nom.Valentine v. Conrad, 110 Ohio St.3d 42, 2006-Ohio-3561. Although Baskies was not called to testify at trial, a voir dire was conducted prior to Guyton's trial testimony, pursuant to the same motion in limine. Appellant argued that the principle of micrometastasis, which formed the basis for much of Guyton's opinion, was likewise only a theory that had not been widely accepted in the medical community, had not been reliably applied, and was not applicable to the case sub judice. On that basis, Appellant objected to any testimony by Guyton on the topics of micrometastasis or histology. The motion in limine was denied.
 {¶ 11} Over Appellant's continuing objection, Guyton testified that recent studies on the subject of micrometastasis have led to a "paradigm shift" in understanding the spread of breast cancer. He testified that according to these studies, in as many as 40 percent of patients, microscopic metastases have already begun to spread to other parts of the body by the time breast cancer is detected. This, Guyton testified, was contrary to the views expressed by Appellant's expert witnesses, suggesting that breast cancer spreads in stages, starting within the breast as a detectable mass, then spreading to the lymph nodes, and finally metastasizing throughout the body. Furthermore, Guyton testified, based on the extent of the metastasis indicated on Shields' bone scan from 2001, he believed that micrometastases had already begun to form on Shields' bones in 1998, making the cancer very difficult to treat even if it had been detected at that point. Guyton specifically stated that he relied on the extent of the cancer shown on the bone scan to make this determination and not on the histology of the cancer cells.
 {¶ 12} We need not decide whether Guyton's theory satisfies the reliability standards required of expert testimony by Daubert and its progeny, as any error on the trial court's part in admitting Guyton's testimony was not prejudicial to Appellant and substantial justice was achieved. A trial court's decision to admit evidence is reviewed for an abuse of discretion. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶ 79. Even if an abuse of discretion exists, however, it results in reversible error only if "the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." Beard v. Meridia Huron Hosp., 106 Ohio St.3d 237,2005-Ohio-4787, at ¶ 35, citing O'Brien v. Angley (1980),63 Ohio St.2d 159, 164-5. In order to determine whether substantial justice has been done, the reviewing court must weigh the prejudicial effect of the error and determine that the trier of fact probably would have made the same decision even if the errors had not occurred. Id., citingO'Brien, supra at 164-5; Hallworth v. Republic Steel Corp. (1950), 153 Ohio St. 349, 359. A determination as to whether substantial justice has been done represents a rare instance where the reviewing court substitutes its judgment, based on the evidence as it should have been presented, for the jury's judgment, based on the evidence as it was actually presented. Hallworth, supra at 358-9. However, the reviewing court must not "usurp the province of the jury" by weighing evidence other than the improperly admitted evidence, "unless the weight, credibility, and effect of that evidence is very substantially in favor of the appellee." Id. at 359. Thus, to the extent that the jury made specific findings based on evidence that was properly admitted, we must defer to those findings.
 {¶ 13} The jury specifically found that Klein only failed to meet the standard of care in one respect: by failing to document a clinical corroboration and order a follow-up mammogram six months after Shields' August 1997 mammogram.1 Although Klein did not perform another examination or order a follow-up mammogram at the six-month point, in February 1998, he did perform a physical examination just one month later, on March 27, 1998, when Shields complained of a retracted nipple. Within about a week of that examination, on April 3, 1998, a mammogram was performed, and Williams performed a physical breast examination later in April 1998. Klein performed yet another breast examination in June 1998. In short, Shields had a mammogram and two physical breast examinations by two different doctors within about two months after the follow-up mammogram was to have been scheduled, followed by another physical examination two months later. Dr. Williams felt some suspicious tissue during his examination, which turned out to be benign, and he saw no reason to biopsy the dense area noted on the 1997 and 1998 mammograms. A mammogram performed early in 2000 still raised no suspicion of cancer. Even in 2001, after Shields' bone scan and subsequent tests revealed that cancer had metastasized from her breast to her skeletal system, examinations by McRoberts and Williams found no masses indicative of cancer, and a diagnostic mammogram came back negative. 1 Appellant urges us to construe the language of the jury's interrogatory to mean that Klein's breach lay in his failure toperform the clinical corroboration and order the six-month follow-up mammogram, and not merely his failure to document these examinations. Indeed, there is no material dispute as to what examinations were performed and when they were performed, and for the sake of argument, we will indulge Appellant's interpretation of the interrogatory.
 {¶ 14} Klein's own expert witness, Dr. Mark Lipton, who did not rely on the theory of micrometastasis expressed by Guyton, indicated in his testimony that not all breast cancers are apparent from ordinary physical examinations or mammograms, and that Shields' cancer likely fell into that category: "[Lipton]. * * * I think, today, in retrospect looking back, tragically, this was just one of those cancers that just could not be found. You can't feel it. You can't see it. You can't find it. "[Appellant's counsel]. Who can't feel it? "[Lipton]. I don't think any doctor felt a mass in her breast that they would characterize as a breast cancer. "[Appellant's counsel]. You're saying — How about [Shields' oncologist] Dr. Trochelman? Dr. Trochelman felt it in 2001 just the day before Dr. Williams didn't feel it, correct? "[Lipton]. This was three years after the biopsy; and he found an area that he was not willing to commit as a breast cancer, as I recall. "[Appellant's counsel]. Dr. Lipton — Dr. Lipton, let me ask you, Dr. Cooper felt it, and Dr. Leeming also felt it, correct, Doctor? "[Lipton]. In '01, they — knowing that she had breast cancer, knowing that she had a biopsy that showed breast cancer, they, at that time, were able to find an area that, `If I have to find it somewhere, I think this is the most likely.'"
 {¶ 15} Likewise, Williams testified that lobular breast cancer — the same kind that Shields had — is a difficult form of cancer to detect either by mammogram or by physical examination.
 {¶ 16} The jury found that Williams complied with the standard of care in all respects and found no breach of the standard of care as to the manner in which Klein performed his examinations. Testimony from Appellant's own expert, Robert Steele, M.D., indicated that the delay in diagnosing Shields' cancer — from 1998 to 2001 — caused her death. Steele testified that had Appellant been diagnosed with cancer in 1998, she would have had an 85 percent chance of surviving ten years, and she would have had a 60 to 70 percent chance of a cure if the cancer had been diagnosed in 1999.
 {¶ 17} The evidence is undisputed, however, that three breast examinations by two doctors in 1998, plus a mammogram performed at about the same time, all failed to detect cancer in Shields' breast, as did subsequent physical examinations and mammograms performed before and even after Shields' 2001 bone scan. The jury found no negligence as to the manner in which these tests were performed. Klein's only breach of the standard of care, according to the jury, was his failure to follow up with a critical clinical corroboration and a mammogram in February 1998. The evidence that Shields nonetheless received a series of physical examinations and a mammogram beginning in March 1998, none of which indicated the presence of cancer, strongly supports the jury's finding that any negligence on Klein's part did not proximately cause Shields' death. Even if the clinical corroboration had been immediately performed and the April 2, 1998 mammogram been performed in a timely fashion (about a month or two earlier than it was actually performed), it is virtually inconceivable that either examination would have indicated any abnormalities that did not manifest themselves on later mammograms or physical examinations. Lipton testified that because tumors only grow over time, it would be "totally illogical" to assume that a cancer which evaded detection after mammograms and physical examinations by several doctors as late as 2001 would have been detected if Shields' 1998 mammogram had been performed a month earlier and if Klein had performed a clinical corroboration of the 1997 mammogram. This position, which is fully consistent with the jury's findings, does not rely at all upon Guyton's theory of micrometastasis. Therefore, even assuming that Guyton's testimony was improperly admitted, the prejudicial effect in Klein's favor would have been minimal, and the jury's verdict probably would not have been affected if the testimony had been excluded. Appellant's sole assignment of error is overruled.
 III. {¶ 18} Appellant's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
SLABY, P., J. MOORE, J., CONCUR
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.)